Filed 10/28/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COUNTY OF SONOMA,<br>      Plaintiff and Respondent,<br>v.<br>JAMES QUAIL,<br>      Defendant;<br>U.S. BANK N.A., as Trustee, etc.,<br>      Appellant;<br>CALIFORNIA RECEIVERSHIP GROUP, INC.,<br>      Respondent. | A155837, A157245<br><br>(Sonoma County Super. Ct.<br>No. SCV256085)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the published opinion filed herein on October 8, 2020, be modified as follows:

The caption of the opinion should be modified to conform with the caption of this order.

On page 18, after the last paragraph in section B.i and immediately preceding section B.ii, insert the following language:

> At oral argument and in its petition for rehearing, U.S. Bank emphasized the principle that a receiver " 'takes the property *cum onere*, in the plight and condition existing at the time of [the receiver's] appointment, subject to all liens and

equities.'" (*Wright v. Standard Engineering Corp.* (1972) 28 Cal.App.3d 244, 248.) While we agree with this general proposition, we fail to see how it limits a court's power to authorize super-priority borrowing in an appropriate case as recognized by *Title Ins. & Trust*. The receivership in this matter did not arise out of a private dispute between competing lienholders with purely monetary interests in the property, a fact U.S. Bank largely ignores. Rather, as noted above, the purpose of a section 17980.7 receivership "is to protect the health and safety of residents who might be substantially endangered by unsafe building conditions." (*Jen, supra*, 135 Ca1.App.4th at p. 311.) The power of a court of equity to issue certificates of indebtedness on a priority basis has long been recognized at common law where the receivership addresses matters of public concern. (See, e.g., *Clifford v. West Hartford Creamery Co.* (Vt. 1931) [153 A. 205, 209] [explaining that authority for super-priority borrowing exists in a railroad receivership because "the maintenance of the roadway and equipment and the continuation of the business and operation of the road are essential, not only to the preservation of the mortgage securities, but also to the welfare and comfort of the general public," citing *Wallace v. Loomis* (1878) 97 U.S. 146, 162]; *Union Trust Co. v. Illinois Midland Ry. Co.* (1886) 117 U.S. 434, 455–456 [confirming authority of railroad receiver to issue certificates with priority over other lienholders and explaining that because a railroad "is a matter of public concern," the court has the power "to make such repairs as are necessary to keep the road and its structures in a safe and proper condition to serve the public. Its power to do this does not depend on consent, nor on prior notice. Consent is desirable, but is seldom practicable, where the debts exceed the value of the property."].)

Finally, we reject U.S. Bank's suggestion that the priority of its lien could not be impacted in these proceedings because it is not a formal party and did not consent to the subordination of its interests. U.S. Bank was notified that a receivership was being sought, appeared at the hearing on the receivership petition, did not object to the appointment of a receiver, and did not appeal from the appointment order. Thus, even if its consent were required—a question we need not decide—substantial evidence supports the conclusion that U.S. Bank acquiesced in the

2

receivership proceedings below. (See *Schreiber v. Ditch Road Investors* (1980) 105 Cal.App.3d 675, 679 ["where a receiver is lawfully appointed at the instance and for the benefit of lien creditors, all proper charges, expenses, and liabilities incurred as incident to duly conferred receivership powers and duties are a charge on the earnings and corpus of the property superior to the lien creditors, who take part in, or expressly or impliedly consent to, or *acquiesce in*, the receivership proceedings" (italics added)].)

On page 26, after the first full paragraph, add a footnote, which will read:

In its petition for rehearing, U.S. Bank suggests that we incorrectly rely on the bill author's May 1990 statement quoted above to explain the later June 1990 amendment which replaced the term "judgment lien" with "lien." That is incorrect. Indeed, U.S. Bank appears to misapprehend the purpose of our review of the legislative history in this matter. By expressly granting a section 17980.7 receiver the broad powers of a Code of Civil Procedure section 564 receiver and permitting borrowing secured by an unspecified lien with court approval, section 17980.7 on its face allows for super-priority borrowing in an appropriate case. We surveyed the legislative history to determine if it contained a clear statement of legislative intent contrary to this apparent meaning. Since the legislative history is, at best, equivocal on this question, it does not support U.S. Bank's claim that the Legislature clearly intended to foreclose super-priority borrowing under both receivership statutes. In short, U.S. Bank needed a smoking gun to prevail on its claim. It failed to uncover one.

This modification does not change the judgment.

The petition for rehearing is denied.


Dated: _____

Humes, P. J.

3

Filed 10/8/20 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COUNTY OF SONOMA,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>U.S. BANK N.A., as Trustee, etc.,<br><br>   Defendant and Appellant.<br><br>CALIFORNIA RECEIVERSHIP GROUP, INC.,<br><br>   Defendant and Respondent. | A155837<br><br>(Sonoma County Super. Ct. No. SCV256085) |
| COUNTY OF SONOMA,<br><br>   Plaintiff,<br><br>v.<br><br>U.S. BANK N.A., as Trustee, etc.,<br><br>   Defendant and Appellant.<br><br>CALIFORNIA RECEIVERSHIP GROUP, INC.,<br><br>   Defendant and Respondent. | A157245<br><br>(Sonoma County Super. Ct. No. SCV256085) |

After many unsuccessful attempts by the County of Sonoma (County) to compel James Quail to abate numerous hazardous and substandard conditions on his real property, the County sought and obtained the

1

appointment of a receiver pursuant to Health and Safety Code[1] section 17980.7 and Code of Civil Procedure section 564 to oversee the necessary abatement work. In these consolidated appeals, U.S. Bank National Association, as Trustee, Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-2 Mortgage Pass Through Certificates Series 2007-2 (U.S. Bank), challenges the superior court's order authorizing the receiver to finance its rehabilitation efforts through a loan secured by a "super-priority" lien on the property. U.S. Bank also challenges the court's subsequent order authorizing sale of the property free and clear of U.S. Bank's lien.

It has long been recognized that trial courts enjoy broad discretion in matters subject to a receivership, including the power to issue a receiver's certificate with priority over preexisting liens when circumstances warrant this extraordinary step. We conclude that the trial court did not abuse its discretion in subordinating U.S. Bank's lien and confirming the sale of the property free and clear of all liens so that the receiver could remediate the nuisance conditions on the property promptly and effectively. However, the court's order prioritizing the County's enforcement fees and costs on equal footing with the receiver finds no basis in the receivership statutes. We therefore affirm the judgment in part, reverse in part, and remand for a determination of the sale distribution consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Failure to Remediate Hazardous Conditions on Property*

Quail was the owner of a 47,480-square-foot lot with two houses, large garages, and several outbuildings in an unincorporated area of Sonoma

---

[1] All statutory references are to the Health and Safety Code unless otherwise specified.

2

County. The property came to the County's attention in May 2013 when an inspection of one of its seven structures revealed hazardous and unpermitted electrical wiring, hazardous decking and stairs, unpermitted kitchens and plumbing, broken windows, and lack of power. In December 2013, this structure was destroyed in a fire and two large outbuildings, unlawfully being used as residential dwellings, were also damaged. One report described the conditions on the property as follows:

"The [p]roperty . . . exists as a makeshift, illegal mobile home park and junkyard. The list of unaddressed violations is extensive, and includes substandard building conditions, substantial fire damage and risk, and a massive accumulation of junk and debris throughout the homes and exterior of the [p]roperty. There are multiple motorhomes, trailers and other vehicles that are not currently registered and many of these are in very poor shape. The property consists of six buildings. In total, there are three dwelling-like units: one fire-damaged barn and two houses, each of these homes with occupants and multiple illegal and unsanitary living conditions. One of the buildings is being occupied by one James Quail and is a legal albeit non-conforming structure with four bedrooms and two bathrooms, that would require significant work to get it up to code. Another structure is being unlawfully occupied by a family, including several young children. . . . There is an additional motorhome and other trailers with occupants inside. The exterior of the [p]roperty alone has approximately 150 yards of debris, and the amount of debris inside of the structures (not counting trailers and motor homes) equates to a similar amount. There is an illegal homeless encampment across the street in a field that has been problematic to the [p]roperty, which occupants both relay concern over but simultaneously seem to involve themselves with."

3

Multiple attempts by the County to gain access to the property for a full inspection were unsuccessful. In December 2013, the County issued two notices and orders for substandard buildings, notifying Quail that the buildings were not to be occupied and directing him to obtain permits either to bring the buildings up to code or to remove them. After Quail continued to deny access to the property, the County filed an ex parte request for an inspection warrant. In support of its request, the County noted that the sheriff's department had responded to 412 "events" concerning the property from 2008 to 2014, including suspicious persons, warrant attempts, and other disturbances. The fire department had responded to the property over 30 times on calls for medical aid. An inspection warrant was issued in July 2014. The resulting inspection revealed a litany of code violations and hazardous conditions.

In September 2014, the County filed a complaint seeking to enjoin the code violations and abate the public nuisances on the property. The parties entered a stipulated judgment in December 2014 in which Quail was permanently enjoined from maintaining violations of the County's building, fire, and zoning codes on the property. He was ordered to abate all violations on the property within 90 days.

Quail failed to abide by the terms of the stipulated judgment. Following inspections in January and February 2017, the County sent letters requesting abatement of violations. When the County reinspected the property in June 2017, not only had the violations set forth in the stipulated judgment not been abated, but the County found more occupied trailers and recreational vehicles and more individuals living in uninhabitable structures that had been ordered vacated. Given these dire circumstances, the County notified Quail—with copies to U.S. Bank, its loan servicer, and all other

4

lienholders on the property—of its intent to seek a court-appointed receiver to oversee the necessary abatement work on the property and to "record a lien against the [p]roperty for the amount of those clean-up efforts" if Quail was unable to pay them. (Italics and bolding omitted.)

**B.    *Appointment of Receiver and Request for Super-priority Lien***

Over the next five months, the County received no response from any of the noticed parties. The property's substandard buildings, unlawful and hazardous constructions, unlawful occupancies, fire hazards, and accumulation of junk, garbage, and debris had been left unattended. Finding an "urgent need" to abate the extensive code violations on the property, the County filed a petition in Sonoma County Superior Court in November 2017 seeking appointment of a receiver under the authority of both section 17980.7 and Code of Civil Procedure section 564. The petition sought authorization for the receiver to finance the necessary repairs and clean-up with a loan secured by a lien with priority over all other previously recorded liens on the property—i.e., a "super-priority lien." The petition requested permission for a receiver's certificate of $30,000 with first priority to cover the initial costs of securing the property and beginning the remediation process. And it asked that all receiver and County fees and expenses also be granted super-priority status, to be paid first out of any proceeds from sale. Copies of the pleadings and all supporting materials were served on U.S. Bank in early January 2018.

On January 19, 2018, the trial court granted the County's petition for appointment of a receiver pursuant to section 17980.7, subdivision (c), and Code of Civil Procedure section 564. The court found that the property was in a condition which substantially endangered the health and safety of the public. The order authorized the receiver to exercise the powers granted to

5

receivers by section 17980.7, subdivision (c)(4), and Code of Civil Procedure section 568. It authorized the receiver to borrow funds to finance the necessary remediation on the property and to fund a $30,000 receivership certificate to cover initial costs. The order further provided that the County was entitled to recover its attorney fees and costs and that such enforcement fees would be given the same priority as those of the receiver. The court denied, however, the County's request to issue the receiver's certificate on a super-priority basis.[2] No appeal was taken from the appointment order.

In May 2018, the receiver filed a motion requesting authorization to obtain a receiver's certificate in the amount of $115,000, secured by a super-priority lien, to ameliorate the nuisance conditions on the property. According to the receiver, he had attempted to negotiate a resolution with the owners and occupants of the property, as well as with U.S. Bank to foreclose on the property, to no avail. The receiver came to the conclusion that the occupants would not vacate and U.S. Bank would not foreclose.[3] Moreover, the receiver was unable to obtain financing to carry out the abatement work because no lender would fund the $30,000 receiver's certificate authorized by the court on a nonpriority basis, given the amount of debt already secured by the property.

The receiver's motion laid out three possible options for remediation of the property. The receiver recommended an intermediate option in which the junkyard conditions would be removed, the most damaged structure on the

---

[2] U.S. Bank had appeared at the hearing and objected only to the court issuing a super-priority receiver's certificate. It did not object to the appointment of a receiver.

[3] Notices of default and sale had been issued against the property in 2012, 2013, and 2016, but no lienholder, including U.S. Bank, had exercised its right of foreclosure.

property demolished, the current occupants relocated, and the property sold as-is to a buyer with the resources to complete the remaining remediation. The receiver estimated clean-up and demolition costs of approximately $46,000, and relocation costs and security of an additional $15,000. What remained would fund the receiver's fees and other costs. The receiver informally estimated the market value of the property after partial remediation to be $249,000, and therefore the property would have sufficient equity to fund the intermediate option. However, since there were several existing liens on the property—including U.S. Bank's recorded lien for approximately $663,000—no lender would fund the necessary receiver's certificate without being granted priority status.

A second option—complete demolition of all structures and sale of the property as a vacant lot with an estimated value of $250,000—was disfavored because it would cost more to complete the demolition and would remove potentially salvageable homes from the housing stock available to fire-damaged victims in the County.[4] A third option allowing for complete remediation of all substandard conditions would result in an estimated market value of $450,000, but would substantially increase both demolition and remediation costs. This option appeared to be economically infeasible due to low property values in the area and a lack of lenders willing to fund at this level. The receiver believed the intermediate option would result in the best outcome for the parties and the community as it would address the nuisance conditions quickly and enable the property to be put back into use in an efficient manner.

---

[4] On our own motion, we take judicial notice of the fact that the Sonoma County wildfires occurred in October 2017. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

U.S. Bank opposed the receiver's motion, arguing that there was no statutory authority for issuance of a priority certificate and that granting a super-priority lien would be inequitable. U.S. Bank also asserted that the motion was premature and argued that a formal appraisal of the property's value was needed before a determination could be made about the super-priority status of the receiver's lien.

At the June 2018 hearing on the motion, the trial court indicated that although it had the ability to authorize a super-priority lien, it needed more information before doing so. The County expressed concern that the property had remained in such horrible condition for years and emphasized that U.S. Bank had refused to do anything to help clean it up. U.S. Bank suggested that any necessary remediation be financed by the County or Quail. The receiver responded that it had explored other options for funding, but there were no public funds or nonprofit monies available. After hearing, the court authorized a receiver certificate in the amount of $115,000, but denied without prejudice the request to give the certificate priority over existing lienholders. U.S. Bank was ordered to obtain an appraisal and file it with the court prior to the next hearing in September 2018.

U.S. Bank did not file the appraisal as ordered. At the September 21, 2018 hearing, the receiver reported that the appraiser had just recently been to the property. The receiver submitted pictures showing the continuing nuisance conditions on the site and explained that although he had sent letters requesting that the occupants vacate the uninhabitable structures, the receiver had no resources to enforce removal or enable relocation. The County reiterated its concerns regarding the ongoing health and safety issues on the property. The trial court stated it was very concerned about conditions on the property and did not intend "to delay this matter one minute further."

8

At U.S. Bank's request, the court allowed a short continuance to October 5, 2018.

## C.     *Order Authorizing a Receiver's Certificate on a Priority Basis*

In advance of the October 2018 hearing, U.S. Bank notified the court that the property had been appraised at $400,000. It requested permission to foreclose on the property and either retain possession and repair the property itself or sell the property as-is to a buyer who would remediate the existing code violations. At the hearing, the court stated that the condition of the property was unacceptable and that it "absolutely intend[ed] to move forward with action necessary to abate this condition." The County objected to U.S. Bank's proposal, fearing that U.S. Bank would not itself remedy the situation and might do a short sale to a party who would likewise fail to remediate the nuisance conditions. The receiver continued supporting its proposal as outlined in its May motion and report. He observed that U.S. Bank had failed to foreclose despite multiple default and foreclosure notices filed on the property. U.S. Bank explained that it had not foreclosed previously because several different bankruptcies had listed the property, requiring it to seek relief repeatedly from the automatic stay. It claimed it now wanted to foreclose, evict, bring the property up to code, and sell it. For his part, Quail maintained that he had control of the property, having lived there for 50 years, and that there were no problems on it.

The court remarked that the matter had not "been moved along in a reasonable manner" and had reached a stalemate because of "inactions" and the absence of funds. Although it agreed that the receiver's request should not be done lightly, it granted the motion "based on the nature of this property, based on the nature of the current status, based on the history of the inability of the proper authorities[, and] based on previous Court rulings that were made months ago, if not longer." On October 10, 2018, the court

issued an order authorizing the receiver to obtain a receiver's certificate in the amount of $115,000, secured by a super-priority lien, to finance the necessary rehabilitation of the property. U.S. Bank appealed from this order.

The receiver filed its second report in advance of the December 2018 status conference. After a lengthy and complicated process, the receiver reported that all residents on the property, including Quail, had been relocated or otherwise removed. In January 2019, the receiver reported that the demolition work had been completed, all buildings had been secured, and the property had been placed on the market, receiving several offers above the list price of $249,000.

## D.    *Order Confirming the Sale of the Property*

Prior to the February 2019 status conference, the receiver recommended that the court authorize sale of the property to a group of buyers, including a neighbor, for $315,000, the highest and best of five offers. According to the receiver, no one in the proposed buyer group had a history of code violations or other issues which might call into question their ability to finish the necessary remediation of the property, and the neighbor, in fact, had purchased the adjoining property from Quail 25 years before and successfully corrected the violations there. The receiver provided the listing agreement and sales contract to the court and asked it to confirm the sale. Given the lack of financial resources available from Quail[5] or the property, the receiver saw no other option than to sell the property as-is with the assurance from the buyer that the remaining nuisance abatement work would be completed post sale. Since there was no way to pay off all of the liens on the property (which approached $1 million), the receiver requested

---

[5] The receiver had paid for a series of motels for Quail to assist in his relocation after his removal from the property. Quail's whereabouts at the time of the report were unknown.

10

that all liens be stripped from the property to effectuate the sale and be attached to the proceeds for later review and distribution by the court. The court continued the matter so that the receiver's request to confirm the sale could be formalized by noticed motion.

After the motion to confirm sale was filed and briefed by the parties, the court heard argument on April 12, 2019. In rendering its decision, the court emphasized the long history of the substandard conditions on the property, concluding that the property had "finally reached a stage, through the efforts of the Receiver and the County and others, to be in a position where, finally, it can be marketed for sale and to abate the numerous, ongoing nuisances and problems with the property."

The court observed that after initially denying the receiver a priority lien, it granted the request because of the ongoing substandard conditions and the inability of the receiver to "move forward in a meaningful manner to address the problems." It noted that U.S. Bank was aware throughout the pendency of the matter of these problems and had opportunities at various points to act. Given "really what is an infamous history of this property and historic litigation," the court found the sale of the property proper. Moreover, the court found that the receiver had been systematic in the manner in which he listed and marketed the property, while U.S. Bank had supplied nothing concrete to contradict the receiver's efforts.

On April 19, 2019, the court issued its order confirming the sale of the property as proposed by the receiver, free and clear of all liens and encumbrances. The order directed that unsatisfied liens on the property would attach to the sale proceeds. The receiver was authorized "to pay the outstanding receivership fees and costs, including the County of Sonoma's demand for fees and costs" per the terms of the January 2018 order

11

appointing the receiver. All remaining sale proceeds were to be held by the receiver pending a court determination regarding appropriate distribution. Potential claimants were directed to submit their claim for funds to the receiver within 30 days.

We granted U.S. Bank's petition for a writ of supersedeas, staying the distribution of all proceeds from the sale of the property pending resolution of this appeal. The Bank then filed a second appeal from the sale order, and we consolidated both matters for argument and decision.[6] In February 2020, we granted the request of Bay Area Receivership Group to file an amicus brief in this matter, supporting the actions of the trial court.

## II.    DISCUSSION

### A.    *Standards of Review*

U.S. Bank raises several issues involving statutory construction, which we review de novo. (*Wells Fargo Financial Leasing, Inc. v. D & M Cabinets* (2009) 177 Cal.App.4th 59, 66 (*D & M Cabinets*); see *City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788, 793 ["Our determination of the proper scope of the trial court's authority and inquiry under section 17980.7(c) is a matter of statutory construction we review de novo."].) However, "[m]ost matters related to receiverships rest in the sound discretion of the trial court" and will not be disturbed on appeal absent an abuse of that discretion. (*City of Sierra Madre v. SunTrust Mortgage, Inc.* (2019)

---

[6] In their initial briefing, the parties disputed whether the trial court's order subordinating U.S. Bank's lien was appealable under the collateral order doctrine. (See *Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545.) In light of U.S. Bank's second appeal from the court's order confirming sale and our consolidation of both appeals, there appears to be no dispute that the entire matter is now properly before us for review. (See *Fish v. Fish* (1932) 216 Cal. 14, 16 [order to pay a receiver's fees and sell property constitutes a collateral, appealable order].)

32 Cal.App.5th 648, 657–658, 660 (*SunTrust*); *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 931 (*Gonzalez*) [court ruling on receivership matters typically "afforded considerable deference on review"].)  "Such deference is the rule, even where the court confirms extraordinary action by the receiver, such as a sale of real property." (*Gonzalez*, at p. 931.)

As summarized by our high court, court orders in receivership proceedings rest "upon the court's 'sound discretion exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and the rights of the respective parties.  [Citation.]  The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision.  [Citation.]  Our view of the facts must be in the light most favorable to the order and we must refrain from exercising our judgment retrospectively.'  [Citations.]  Where there is no evidence of fraud, unfairness, or oppression, the court has wide discretion in approving the receiver's proposed actions." (*Gonzalez*, *supra*, 43 Cal.4th at p. 931.)

## B.  *Trial Courts May Issue Receivership Certificates with Priority Over All Other Liens in Appropriate Circumstances*

Section 17980.7 authorizes the judicial appointment of a receiver in situations where substandard conditions on a property substantially endanger the health and safety of the public, and the property owner has been unable or unwilling to remediate those conditions.  The law permits the appointment of a receiver to assume control of the property and abate the nuisance conditions or to take other appropriate actions as may be authorized by the court.  (§§ 17980.6, 17980.7; *Gonzalez*, *supra*, 43 Cal.4th at p. 912.)

U.S. Bank argues that this remedial statute does not authorize the court to issue a super-priority lien to fund the receiver's remediation efforts.  According to U.S. Bank, lien priority is a creature of statute and the statutory

13

language of section 17980.7, when read as a whole, supports the conclusion that the Legislature intended the ordinary rules of lien priority to apply. (See Civ. Code, § 2897 ["Other things being equal, different liens upon the same property have priority according to the time of their creation."])  Thus, U.S. Bank contends, the trial court erred when it granted the receiver's request to borrow funds on a super-priority basis, thereby displacing U.S. Bank as senior lienholder.

U.S. Bank's arguments miss the mark for two reasons.  First, U.S. Bank ignores that the receiver was appointed here under *both* section 17980.7 and Code of Civil Procedure section 564, the general receivership statute.  Under well-established principles, trial courts enjoy broad discretion in matters subject to a receivership, including the power to issue receiver's certificates with priority over preexisting liens.  Second, as we address in section B.ii. *post*, section 17980.7 is consistent with this established authority and nothing about its statutory language or legislative history suggests that the Legislature intended to circumscribe the traditional powers of a receivership recognized under Code of Civil Procedure section 568.

### i. *Traditional Authority Vested in a Receivership Includes the Power to Issue Certificates with First Priority*

A receiver is an officer and agent of the appointing court and is under the direct control and supervision of the court.  (*Gonzalez*, *supra*, 43 Cal.4th at p. 930; see *SunTrust*, *supra*, 32 Cal.App.5th at p. 656 ["a receiver only has those powers granted to it by statute or an order of the court"].)  The receiver is not an agent of any particular party but rather acts for the benefit of all parties interested in the property.  (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685; Cal. Rules of Court, rule 3.1179(a).)

"Section 568 of the Code of Civil Procedure—first enacted in 1872— gives a receiver appointed under section 564 very broad powers."  (*SunTrust*,

14

*supra*, 32 Cal.App.5th at p. 659.)  Specifically, "[t]he receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and *generally to do such acts respecting the property as the court may authorize.*" (Code Civ. Proc., § 568, italics added.)  "Courts also have substantial discretion to authorize a receiver to borrow money to fund the preservation and management of property in the receivership estate, particularly where, as here, the estate does not produce income.  In that circumstance, the receiver may ask the court to authorize the issuance of a receiver's certificate to the lender as security for money loaned to the estate." (*SunTrust*, at p. 657.)

For over 100 years, these powers have been interpreted to include a court's authority to fund a receivership on a super-priority basis in the appropriate circumstance.  In *Title Ins. & Trust Co. v. California Development Co.* (1915) 171 Cal. 227 (*Title Ins. & Trust*), the Supreme Court affirmed a trial court's decision authorizing receiver's certificates with priority over existing bonded indebtedness, stating that "there can be no question of the right of the court to give priority to certificates issued to enable the receiver to carry out the primary object of [the receiver's] appointment, viz., the care and preservation of the property." (*Id.* at p. 231; see *SunTrust, supra*, 32 Cal.App.5th at p. 657, citing *Title Ins. & Trust* and quoting 12 Miller & Starr, Cal. Real Estate (4th ed. 2018) § 41.12, p. 41-33 ["Receivership certificates are then issued as evidence of the indebtedness and become liens on the subject property when issued under the direction and control of the court, usually with priority over all other liens, including preexisting liens."].)  Decisions regarding the issuance and priority of

15

receiver's certificates are committed to the sound discretion of the trial court. (*Title Ins. & Trust Co.*, at p. 233; see *ibid.* [the trial court, "upon a consideration of all the facts, determined that the certificates should equitably be given priority over the bonds, and we think its conclusion should not be interfered with"]; 12 Miller & Starr, Cal. Real Estate, *supra*, at pp. 41-33 to 41-34 ["Whether receiver's certificates should be issued, and whether those certificates when issued should be given priority over the other indebtedness already of record against the property, are decisions that rest largely in the discretion of the court."].)

U.S. Bank's attempts to distinguish *Title Ins. & Trust* are unavailing. It argues that the case strictly limits the use of receiver's certificates with priority over other liens to expenditures required for the "necessary care and preservation" of receivership property, and that such certificates are therefore inappropriate in the context of a section 17980.7 receivership, which by statutory design exists solely to *improve* property through the remediation of existing code violations. We have little difficulty concluding, however, that a receiver's efforts pursuant to section 17980.7 to ameliorate property conditions which substantially endanger public health and safety— the "primary object" of the receiver's appointment—are taken as part of the "necessary care and preservation" of the receivership property. Similarly unpersuasive is U.S. Bank's claim that *Title Ins. & Trust* is limited by its facts to situations where a majority of existing lienholders request the receivership and agree to subordinate their interests to fund it. Nothing in the Supreme Court's analysis makes such facts necessary or controlling. At most, specifics regarding the creation of the receivership were among "all the facts" that were considered by the trial court in the exercise of its broad discretion. (*Title Ins. & Trust*, *supra,* 171 Cal. at p. 233.)

16

Indeed, the Second District recently followed *Title Ins. & Trust* under facts strikingly similar to the present case. (See *SunTrust*, *supra*, 32 Cal.App.5th 648.) Like the instant action, *SunTrust* involved the appointment of a receiver pursuant to section 17980.7 and Code of Civil Procedure section 564 to undertake remediation of a residential property after the owners refused to abate existing nuisance conditions. (*SunTrust,* at pp. 651–652, 658.) As here, the senior lienholder (SunTrust) did not challenge the appointment of the receiver but objected only when the receiver proposed to borrow $250,000 on a super-priority basis to fund the remediation. (*Id.* at p. 652.) The receiver argued that because there was insufficient equity in the property, no lender would loan funds to the receiver unless the indebtedness was given priority over all preexisting liens. (*Id.* at pp. 654–655.) The trial court granted the receiver's request. (*Id.* at p. 655.)

On appeal, SunTrust argued that no statute allows the issuance of a super-priority lien, pointing to the absence of any provision in section 17980.7 expressly authorizing such a funding mechanism. (*SunTrust*, *supra*, 32 Cal.App.5th at p. 658.) The appellate court concluded, however, that it was "unnecessary to engage in a lengthy statutory analysis of [section 17980.7] because . . . the receiver was also appointed under Code of Civil Procedure section 564." (*SunTrust*, at p. 659.) Citing *Title Ins. & Trust* and the broad language of Code of Civil Procedure section 564, the appellate court concluded that this authority allowed a receiver to issue a super-priority lien "in appropriate circumstances." (*SunTrust*, at p. 659.)

Although the *SunTrust* court acknowledged that "the use of super-priority liens should be infrequent because the disturbance of preexisting liens may bring harsh consequences" (*SunTrust supra*, 32 Cal.App.5th at p. 568), it concluded that the trial court did not abuse its discretion in

authorizing super-priority borrowing under the circumstances presented. (*Id.* at pp. 660–661.) The court pointed out that after the property owners refused to abate the nuisance conditions, SunTrust chose not to take any action against them, despite the fact that the owners were clearly in breach of their deed of trust. (*Id.* at p. 660.) Because neither the owners nor SunTrust were willing to fund the costly remediation and the property did not produce income, no lender would finance the receiver's remediation efforts except on a super-priority basis. (*Ibid.*) Finally, in rejecting SunTrust's contention that its interest in the property was inequitably displaced, the court observed that SunTrust's lien was nearly worthless because the costs of remediation exceeded the value of the unimproved land. It concluded that SunTrust's suggestion—that it should remain the senior lienholder and "benefit from the increased property value provided by the remediation while bearing none of the cost"—was "simply untenable." (*Id.* at p. 661.)

We agree with *SunTrust* that the trial court may exercise its broad discretion under Code of Civil Procedure section 568 and *Title Ins. & Trust* to authorize the issuance of a receiver's certificate with priority over all preexisting liens to fund the preservation and management of property in the receivership estate. This authority applies equally to receiverships appointed in parallel with section 17980.7 to remediate property conditions which substantially endanger the health and safety of the public.

### ii. *Section 17980.7 Does Not Circumscribe or Displace the Traditional Powers of a Receivership*

U.S. Bank faults the *SunTrust* court for failing to examine the statutory language and legislative history of section 17980.7 and the broader statutory scheme giving local governments many options for addressing nuisance properties. It contends that the Legislature, by enacting section 17980.7, intended both to prohibit the use of super-priority liens *and* to

18

occupy the field with respect to these types of health and safety receiverships. Neither the language nor the legislative history of section 17980.7 supports this view.[7]

"The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citation.] 'We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citation.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' " (*City and County of San Francisco v. Jen* (2005) 135 Cal.App.4th 305, 310 (*Jen*).)

Sections 17980.6 and 17980.7 "compose a statutory scheme providing certain remedies to address substandard residential housing that is unsafe to occupy. Pursuant to section 17980.6, an enforcement agency may issue a notice to an owner to repair or abate property conditions that violate state or local building standards and substantially endanger the health and safety of

---

[7] In April 2019, we granted U.S. Bank's request that we take judicial notice of selected portions of the legislative history for section 17980.7. On our own motion, we take judicial notice of the entire legislative history of Assembly Bill No. 3492 (1989-1990 Reg. Sess.). (Evid. Code, §§ 452, subds. (a) & (c), 459; see *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1041, fn. 4, disapproved on another ground in *Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 345, fn. 6.)

19

residents or the public.  Section 17980.7 provides that, if the owner fails to comply with the notice despite having been afforded a reasonable opportunity to do so, the enforcement agency may seek judicial appointment of a receiver to assume control over the property and remediate the violations or take other appropriate action." (*Gonzalez, supra*, 43 Cal.4th at p. 912; accord *City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 465–466.)  "The obvious and stated purpose of section 17980.6 [and section 17980.7] is to protect the health and safety of residents who might be substantially endangered by unsafe building conditions." (*Jen, supra*, 135 Cal.App.4th at p. 311.)

Subdivision (c)(4) of section 17980.7 enumerates a set of "powers and duties" that a receiver must follow in the "order of priority" listed "unless the court otherwise permits."  The receiver is empowered by statute to "take full and complete control of the substandard property"; to "manage the substandard building" and pay its operating expenses, taxes, insurance, utilities and debt servicing; to "secure cost estimates" and "enter into contracts" to abate the code violations; to "collect all rents and income" and to "use all rents and income from the substandard building to pay for the cost of rehabilitation and repairs"; and to "borrow funds to pay for repairs necessary to correct the conditions cited in the notice of violation and to borrow funds to pay for any relocation benefits authorized by paragraph (6) [of the statute]." (§ 17980.7, subd. (c)(4)(A)-(G).)  Moreover, "with court approval," the receiver is authorized to "secure that debt and any moneys owed to the receiver for services performed pursuant to this section with a lien on the real property upon which the substandard building is located.  The lien shall be recorded in the county recorder's office in the county within which the building is located." (§ 17980.7, subd. (c)(4)(G).)

U.S. Bank points out that section 17980.7 makes no mention of authorizing liens on a super-priority basis, and it notes that the law prioritizes paying "debt secured by an interest in the real property" (§ 17980.7, subd. (c)(4)(B)) before borrowing funds and securing the debt with a lien on the real property (*id.*, subd. (c)(4)(G)). "Far from showing an intent to allow receivers to extinguish the interests of secured creditors," U.S. Bank contends, "the Legislature . . . affirmatively showed its intent to protect them." We disagree.

As discussed above, the primary object of a section 17980.7 receivership is to remediate code violations on a property that "are so extensive and of such a nature that the health and safety of residents or the public is substantially endangered" (§ 17980.6; see § 17980.7)—not to ensure that debt payments are not missed. (*Gonzalez*, *supra*, 43 Cal.4th at p. 912; *Jen*, *supra*, 135 Cal.App.4th at p. 311.) While section 17980.7 generally directs that remediation expenses should first be paid out of the rents and income derived from the property before funds are borrowed, the statute expressly allows the receiver to proceed by another manner when "the court otherwise permits." (§ 17980.7, subd. (c)(4).) This flexibility is further confirmed by section 17980.7, subd. (c)(4)(H), which authorizes the receiver "[t]o exercise the powers granted to receivers under Section 568 of the Code of Civil Procedure." By its own terms, section 17980.7 incorporates the traditional power of receivers "to do such acts respecting the property as the Court may authorize." (Code Civ. Proc., § 568.) In sum, we do not read section 17980.7 to preclude the use of a super-priority lien when it is authorized by the trial court in an appropriate circumstance.

The legislative history of section 17980.7 does not compel a different result. When first introduced as Assembly Bill No. 3492, the original draft

21

provided an express procedure for super-priority borrowing by receivers. Specifically, before a receiver could borrow funds, the bill required the receiver to give existing lienholders the opportunity to increase their debt to pay for the necessary repairs or to foreclose. (See Assem. Bill No. 3492 (1989-1990 Reg. Sess.) (Assembly Bill 3492) as introduced Feb. 28, 1990 at pp. 4–5.) The draft legislation further provided: "If the existing lienholders decide not to provide the funds for repair and if they choose not to foreclose their security, the receiver may borrow funds and secure the debt with an encumbrance on the real property upon which the substandard building is located which shall constitute a lien on that real property, superior to all prior liens and encumbrances, except taxes." (*Id.* at p. 5.)

This language was later deleted after opposition from the California Bankers Association. (See Assembly Bill 3492, as amended Apr. 30, 1990 at pp. 5-6; see also Maurine C. Padden, Cal. Bankers Assn., letter to Chairman Dan Hauser, Assem. Housing and Community Development Comm., Apr. 11, 1990.) U.S. Bank argues that this sequence of events evidences a legislative intent to disallow super-priority borrowing by section 17980.7 receivers. U.S. Bank omits an important part of the story.

When Assembly Bill 3492 was amended to delete reference to super-priority borrowing, the relevant subsection of the statute was also amended to provide that receivers could secure debt only with court approval and only with a lien having "the force, effect, and priority of a judgment lien." (Assembly Bill 3492 as amended Apr. 30, 1990, at p. 5.) Because a judgment lien is generally subject to the first-in-time rule of lien priority (Civ. Code, §§ 2897, 2898; see *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 600–601), the proposed amendment would not have allowed trial courts to give receivership liens super-priority status.

22

However, another amendment subsequently deleted the reference to judgment lien priority and required immediate service of any petition requesting appointment of a receiver on all persons with a recorded interest in the subject real property. (Assembly Bill 3492 as amended June 28, 1990 at pp. 3–4.) This left the borrowing provision as it was ultimately enacted. (§ 17980.7, subd. (c)(4)(G) [authorizing receiver to "borrow funds . . . and, with court approval, secure that debt and any moneys owed to the receiver for services performed pursuant to this section with a lien on the real property upon which the substandard building is located"].) [8] The removal of the specific authorization for super-priority borrowing from Assembly Bill 3492 was explained by the author as follows: "I have added author's amendments . . . to delete a first priority for a lien secured by a receiver. Such blanket authority may not be appropriate in certain cases, so the bill now specifies that any financing arrangement by a receiver would be subject to court approval." (Assem. Comm. on Ways and Means, Author Hearing Notice for Assembly Bill 3492, May 6, 1990, at pp. 1–2.)

This legislative history indicates that the Legislature did not foreclose the use of super-priority liens to fund section 17980.7 receiverships, but rather intended any financing arrangement to be reviewed and approved by the court under the particular facts of each case and only after mandatory notice to all affected lienholders. The Civil Code defines "lien" generally as "a

---

[8] As enacted, Assembly Bill 3492 provided for service of a receivership petition on all persons with a record interest in the real property at least three days before the filing of any petition seeking a receivership. (See Stats. 1990, ch. 1334, § 1, p. 5785.) Effective October 8, 2019, this requirement was amended to allow for notice by first class mail on all persons with a record interest, posting on the property, and service on the owner. (See § 17980.7, subd. (c); Stats. 2019, ch. 620, § 4 (Assem. Bill No. 957 (2019-2020 reg. sess.).)

23

charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act." (Civ. Code, § 2872.) On the other hand, when the Legislature wants to treat a lien like a judgment lien, it clearly knows how to do so. (See, e.g., Gov. Code, §§ 25845, subds. (e), (g) [authorizing recordation of an abatement lien with "the same priority as a judgment lien on real property"], 38773.1, subds. (a), (c) [authorizing nuisance abatement lien, which "from the date of recording shall have the force, effect, and priority of a judgment lien"] & 54988, subds. (a)(1), (c) [same].)

That the Legislature chose to eliminate similar language from Assembly Bill 3492, keeping the type of lien unspecified, argues in favor of a construction which leaves lien priority in this context to the discretion of the trial court. (See *Hicks v. E.T. Legg & Assocs.* (2001) 89 Cal.App.4th 496, 507 [" ' "It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." ' "]; see also *Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning."].)[9]

---

[9] U.S. Bank points to a statement in the Republican Analysis of Assembly Bill 3492 that " 'Senate amendments make any lien filed against the property a standard lien . . . so that it does not have priority over other loans.' " However, the full statement reads as follows: "Senate amendments make any lien filed against the property a standard lien, instead of a judgment lien, so that it does not have priority over other loans." (Assem. Comm. on Housing and Community Development, Republican Analysis of Assembly Bill 3492, Aug. 29, 1990.) We disagree with this statement. As discussed above, the decision to omit how a receivership lien should be

24

Our reading of the legislative history is further bolstered by the fact that, as enacted, section 17980.7 expressly authorizes section 17980.7 receivers "[t]o exercise the powers granted to receivers under Section 568 of the Code of Civil Procedure" (§ 17980.7, subd. (c)(4)(H))—a statute that, as discussed above, has long been interpreted to authorize the funding of a receivership on a super-priority basis in an appropriate case. (See *Title Ins. & Trust*, *supra*, 171 Cal. at p. 231.) "We do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied." (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 199.) Thus, nothing in the text or legislative history of section 17980.7 suggests an intent by the Legislature to circumscribe or displace the traditional powers of a receiver appointed under Code of Civil Procedure section 564.

On the contrary, legislative committee reports repeatedly acknowledge that section 17980.7 was intended to reconfirm the trial court's authority under Code of Civil Procedure section 564 to appoint receivers to remediate substandard properties. (See, e.g., Concurrence in Sen. Amends. for Assembly Bill 3492, as amended Aug. 24, 1990, at p. 1 ["Currently, Section 564 of the Code of Civil Procedure authorizes the superior court to appoint a receiver for a number[] of causes, including '. . . where it is shown that the property or fund is in danger of being lost, removed, or materially injured.' "]; Sen Comm. on Judiciary, Rep. on Assembly Bill 3492, as amended June 28, 1990, at p. 2 (Sen. Comm. on Judiciary Analysis) [same].) Because judges appeared reluctant to appoint receivers pursuant to the general authority of Code of Civil Procedure section 564, Assembly Bill 3492 was proposed to

treated signals a legislative intent to allow the trial court to determine in its discretion the priority status of such a lien.

make the authority for appointing a receiver under these circumstances "more explicit." (Sen. Comm. on Judiciary Analysis, *supra*, at p. 2 ["The purpose of this bill is to give courts explicit authority to appoint a receiver to oversee repairs of a substandard building where the owner has refused to do so."].)[10]

In sum, both the text and legislative history of section 17980.7 evince a legislative intent to supplement rather than supplant the traditional powers of a receiver under Code of Civil Procedure section 568. (§§ 17980.7, subd. (c)(4)(H) [authorizing receivers "[t]o exercise the powers granted to receivers under Section 568 of the Code of Civil Procedure]; 17980.7, subd. (g) ["These remedies shall be in addition to those provided by any other law"]; see *City and County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 742, fn. 6 (*Daley*) [citing § 17980.7, subd. (g) in concluding that § 17980.7 "does not affect the availability of a receiver under Code of Civil Procedure section 564"].)

Finally, having concluded that a court's authority to impair property rights subject to receivership in an appropriate case has been recognized for over 100 years, we decline U.S. Bank's suggestion that a different interpretation of the relevant statutes is required by the constitutional

---

[10] Since Assembly Bill 3492 was enacted to address an unmet need with respect to the rehabilitation of substandard residential properties, it is apparent that the existing tools available to local governments in this arena—such as abatement or eminent domain—were not always sufficient to ameliorate this significant health and safety issue. (See, e.g., Dept. of Housing and Community Development, Enrolled Bill Report on Assembly Bill 3492, as amended Aug. 24, 1990, at p. 3 [noting "that many legal service practitioners in the housing field share the belief that current code enforcement mechanisms are often ineffective"].) U.S. Bank's contention that the existence of these other options somehow argues against the availability of priority financing thus misses the point of the legislation.

avoidance canon.  (See *People v. Engram* (2010) 50 Cal.4th 1131, 1161 ["a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question"].)  U.S. Bank's relatively undeveloped assertion that the exercise of such authority by a court supervising a health and safety receivership constitutes an unconstitutional taking (Cal. Const., art. I, § 19(a); U.S. Const., 5th Amend.) and/or an impairment of contract (Cal. Const., art. I, § 9; U.S. Const., art I, § 10, cl. 1), or "at least raise[s] a significant constitutional issue," does not persuade us to part ways with this longstanding precedent.

## C.     *The Subordination Order Was Not an Abuse of Discretion*

Having concluded that the trial court was authorized to secure the receiver's borrowing with a super-priority lien under both receivership statutes, we turn to the question whether the trial court abused its discretion by giving the receiver's certificate first priority over all other liens.  We conclude that it did not.

As the record makes clear, the subject property was not capable of generating income and was underwater, making standard secured borrowing impossible as a means of financing the remediation of the property.  Quail had no resources to offer and the receiver reported that his efforts to obtain funding from nonprofits or other sources proved unsuccessful.  Adding urgency to the situation, the property posed a significant hazard to the health and welfare of the public and its occupants, with several families living in unsanitary or uninhabitable conditions, a massive accumulation of junk and debris, fire damaged structures and other attendant fire risks, and frequent responses to the property by the sheriff's department and the fire department.  These conditions had persisted for years despite numerous attempts by the County to enforce the code violations.

27

Against this backdrop, the receiver's plan to obtain priority financing to fund a partial remediation of the property and to sell to a buyer willing to complete the remaining repairs appeared reasonably designed to address the nuisance conditions quickly and effectively, once and for all. " ' "As a general proposition the costs of a receivership are primarily a charge upon the property in the receiver's possession and are to be paid out of said property." ' " (*SunTrust*, *supra*, 32 Cal.App.5th at p. 657, quoting *Baldwin v. Baldwin* (1947) 82 Cal.App.2d 851, 855.) Here, the receiver's plan allowed the costs of the receivership to be paid by the property, placing any risk of loss on those with financial interests in the property, and avoided the use of public monies to enhance the value of those private financial interests.

U.S. Bank nevertheless argues that the court's subordination order was an abuse of discretion because it had offered to foreclose and take care of the problems itself, which would have avoided the need for the receiver and its attendant costs. On this record, however, we see no abuse of discretion in the court's rejection of U.S. Bank's belated proposal. U.S. Bank had notice of the severe health and safety issues on the property since at least June 2017 and took no action to address the problems prior to the appointment of the receiver in January 2018, or before the receiver renewed its request for super-priority financing in May 2018, or even before the court finally granted that request in October 2018. It was only at the October 2018 hearing that U.S. Bank finally asked the court for permission to foreclose and either repair the property itself or sell to a buyer who could remediate the nuisance conditions.

Prior to the October hearing, the court had ordered U.S. Bank to obtain an appraisal of the property, which it failed to do in a timely manner despite being given three months to do so. The County expressed concern that, if left

28

to its own devices, U.S. Bank would not remedy the situation and might sell to a party who would likewise fail to fix the many hazards on the property. Given U.S. Bank's extended history of indifference and inaction, we cannot fault the trial court for viewing its last-minute offer to foreclose with skepticism. In contrast, it was only through the efforts of the receiver that the conditions on the property started to improve. Within three months of the court's order authorizing the receiver's certificate on a priority basis, the receiver had removed or relocated all of the occupants on the property, secured all the buildings, completed the demolition work, listed the property, and was weighing several offers above the asking price. Under the circumstances, the court acted well within its discretion in concluding that the process most likely to result in the expeditious and total remediation of the health and safety issues on the property was the plan put forward by the receiver.

### D. *Order Confirming Sale Free and Clear of All Liens Was Not an Abuse of Discretion*

In the second of these consolidated appeals, U.S. Bank attacks the court's subsequent order confirming the sale of the property free and clear of liens. It asserts that the sale confirmation process failed to comply with statutory requirements. U.S. Bank also contends that the court's sale order was not supported by the evidence, making it an abuse of discretion. Both contentions lack merit.

It is beyond dispute that a court overseeing a health and safety receivership has the authority to sell receivership property. (See *Gonzales*, *supra*, 43 Cal.4th at p. 930 [holding that section 17980.7 "empowers the receiver to sell the property or to take any other action respecting the property as the court may authorize," citing § 17980.7, subd. (c)(4)(H) & Code Civ. Proc., §§ 568, 568.5; see also *Cal-American Income Property Fund VII v.*

29

*Brown Development Corp.* (2008) 138 Cal.App.3d 268, 273–274 ["Code of Civil Procedure sections 568 and 568.5 authorize the receiver to perform such acts respecting the property as the court may authorize, including the sale of real and personal property upon notice and subject to court confirmation."].) According to U.S. Bank, any such sale must occur in accordance with the Enforcement of Judgments Law (Code Civ. Proc., § 680.010 et seq.) (EJL) because Code of Civil Procedure section 568.5—the statute authorizing a receiver to sell property—states that all sales must be "in the manner prescribed by Article 6 (commencing with Section 701.510) of Chapter 3 of Division 2 of Title 9," i.e., the sale provisions of the EJL.  U.S. Bank is mistaken.

What Code of Civil Procedure section 568.5 actually states is that "[a] receiver *may*, pursuant to an order of the court, sell real or personal property in the receiver's possession upon the notice and in the manner prescribed by [the EJL]."  (Italics added.)  Moreover, Code of Civil Procedure section 568 grants receivers the general power "to do such acts respecting the property as the Court may authorize."  Read together, these provisions permit a court to tailor the method of sale of receivership property to the circumstances before it.  Indeed, several courts have recognized "the broad power of a court to determine the manner in which [receivership] property should be sold." (*People v. Riverside University* (1973) 35 Cal.App.3d 572, 584 (*Riverside*).)

In *Lesser & Son v. Seymour* (1950) 35 Cal.2d 494 (*Lesser*), for example, the Supreme Court upheld a court's authority to confirm a sale of receivership assets in a manner which conflicted with its prior order of sale. (*Id.* at p. 499.)  In doing so, the high court reasoned:  "[T]he main function of the court is to manage or dispose of the estate in the best manner possible and for the best interest of the parties concerned.  To effectually perform that

30

duty necessarily requires some flexibility and continuity of jurisdiction in giving instructions to the receiver as to the manner in which the property should be sold to meet exigencies as they may arise." (*Ibid*.) In support of this conclusion, the court noted that "[t]he receiver is a mere agent and the property in [the receiver's] hands is really under the control and continuous supervision of the court." (*Ibid.*.)

Thereafter, the appellate court in *Riverside*, *supra*, 35 Cal.App.3d 572, expressly addressed and rejected the argument U.S. Bank advances here. Relying on *Lesser*, the court opined: "In the absence of more explicit language, we cannot read section 568.5 as a restriction upon the inherent equitable power of the court to prescribe the manner in which a receiver may sell property. To effectively discharge its responsibility of managing for the best interest of the parties concerned the assets placed in the hands of a receiver, the court must, as stated in [*Lesser*], necessarily maintain a degree of flexibility with respect to the time and manner in which property should be sold to meet exigencies as they arise. [Citing *Lesser*, *supra*, 35 Cal.2d at p. 499.]" (*Riverside*, at p. 585.) Contrary to U.S. Bank's position, the better reading of Code of Civil Procedure section 568.5 is that "unless the court prescribes a different mode of sale, a receiver, when authorized, must sell property in the manner provided for sales on execution." (*Riverside*, at p. 585.) Given this precedent, we have no difficulty concluding that the trial court possessed the authority to confirm the sale of the property in this case despite the receiver's failure to follow the specific procedure outlined in the EJL.

*D & M Cabinets*, *supra*, 177 Cal.App.4th 59 is distinguishable. In that case, the receiver was appointed under the EJL itself— pursuant to Code of Civil Procedure section 708.620—to enforce a money judgment. (See *D & M*

*Cabinets*, at p. 62.)  The court held under those circumstances that certain homestead requirements set forth in the EJL applied whether the sale was conducted by a sheriff or an EJL receiver.  (*D & M Cabinets*, at p. 73.)  Indeed, the court distinguished *Gonzalez, supra*, 43 Cal.4th 905, stating that *Gonzalez* "involved a receivership to demolish uninhabitable property due to building code violations; it had nothing to do with the EJL."  (*D & M Cabinets*, at p. 76.)

Nor are we persuaded that, as a general matter, the court's sale order amounted to an abuse of discretion.  As discussed above, "[a]n order authorizing the receiver to sell substandard structures that pose a substantial health and safety risk is reviewed for abuse of discretion and is afforded considerable deference."  (*City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 683 (*Horspool*); see *Gonzalez, supra*, 43 Cal.4th at p. 931.)  U.S. Bank argues that the sale order at issue was an abuse of discretion because there was insufficient evidence to support the reasonableness of the sales price or that the proposed sale would benefit the receivership estate, facts critical to the trial court's decision.  Ample evidence, however, supports the court's approval of both the sales price and the sale process.  Certainly, there is no evidence of "fraud, unfairness, or oppression." (See *Gonzalez*, at p. 931.)

The list price of $249,000 was based on a broker's price opinion of the market value of the property after the partial remediation was completed. The only other valuation evidence in the record was U.S. Bank's appraisal of $400,000.  It is not clear that the appraisal considered the ongoing nuisance conditions on the property or the need for any buyer to complete the remaining remediation post sale.  Indeed, there is some evidence that the appraisal did not take these factors into account, as the highest of the five

32

offers received after the property was marketed for sale was the $315,000 offer the receiver asked the court to confirm. Moreover, U.S. Bank supplied no concrete evidence to suggest any irregularity in the receiver's open market process. In any event, "other considerations may outweigh the need to maximize the sales price to the receivership." (*People v. Stark* (2005) 131 Cal.App.4th 184, 207.) Here, it was a matter of utmost importance that any potential purchaser be willing and able to work with the County to complete the remaining nuisance abatement, and the potential purchasers appeared to be excellent candidates in this regard. On this record, we see no abuse of discretion in the court's confirmation of a $315,000 purchase price. (*Riverside*, *supra*, 35 Cal.App.3d at p. 582 [" 'Generally speaking if no good reason appears for refusing to confirm a receiver's sale, such as chilling of bids or other misconduct or gross inadequacy of price, the sale should be confirmed.' "].)

U.S. Bank's additional argument—that the approved sale process was improper because it had offered to foreclose and find a buyer willing to address the nuisance conditions—is largely a rehash of the argument we rejected above. It is true that " 'receivers are often legal luxuries, frequently representing an extravagant cost to a losing litigant.' " (*Daley*, *supra*, 16 Cal.App.4th at p. 744.) In this case, however, U.S. Bank did not challenge the initial appointment of the receiver and proposed foreclosure only when the primacy of its lien was at risk. As discussed above, the trial court's apparent lack of confidence that U.S. Bank would do what it said it would in a timely and effective manner finds ample support in the record.

Moreover, as the trial court found, the only way to complete the required rehabilitation was to sell the property to a third party with the resources to complete the remaining repairs. This, in turn, could only be

accomplished by stripping the property of its existing liens, including the lien held by U.S. Bank. While U.S. Bank argues strenuously that such lien stripping goes beyond the court's authority, precedent supports a contrary view. As our high court confirmed when it upheld a trial court's decision under a section 17980.7 receivership to completely demolish a substandard building, receivership orders in this context may involve "extraordinary action," and such orders are afforded substantial deference even when they are "drastic enough to extinguish an owner's interest in property." (*Gonzalez*, *supra*, 43 Cal.4th at p. 931.)

In *Horspool*, *supra*, 223 Cal.App.4th 670, the Fourth District addressed a situation similar to the instant appeal. The city sought appointment of a section 17980.7 receivership after the property owner refused to abate nuisance conditions on a residential property. The receiver obtained permission from the trial court to sell the partially remediated property "as-is" to a buyer willing to complete the repairs. To effectuate the sale, the court stripped the property of its existing liens. (*Id.* at pp. 675–678.) In affirming the actions of the trial court, the appellate court expressly opined that "[a] court of equity has the power to order the sale of property free and clear of liens and encumbrances." (*Id.* at p. 684.) And in the *SunTrust* case discussed above, the appellate court rejected many of the same arguments that U.S. Bank advances here, upholding the subordination of *SunTrust*'s lien against the lender's contention it was allowing the lien " 'to be essentially stripped to nothing.' " (*SunTrust*, *supra*, 32 Cal.App.5th at p. 660.) We thus conclude that the trial court here had the authority to authorize the sale of property free and clear of all liens and encumbrances, and its decision to do so in this extraordinary case cannot be characterized as an abuse of its discretion.

34

***E.*** ***The Order Prioritizing the County's Fees and Costs on an Equal Footing with the Receiver's Was an Abuse of Discretion***

We agree with U.S. Bank in one respect. Although we conclude that Code of Civil Procedure 568 and section 17980.7 allow for the payment of a receiver's remediation fees and costs on a super-priority basis under appropriate circumstances, we see no such authority for treating the County's attorney fees and costs in a similar fashion. As noted above, the receiver is an officer of the appointing court, in effect an extension of the court itself. (*Gonzalez, supra*, 43 Cal.4th at p. 930.) Although the County set in motion the appointment of the receiver in this matter, it does not occupy the same role as the receiver. *Title Ins. & Trust* and *SunTrust* support the notion that a *receivership* created pursuant to Code of Civil Procedure sections 564 and 568 may be funded, in an appropriate case, on a super-priority basis. (See *Title Ins. & Trust, supra*, 171 Cal. at p. 231; *SunTrust, supra*, 32 Cal.App.5th at p. 657.) These authorities, however, do not address the fees and costs incurred by an enforcement agency.

Nor does section 17980.7 assist the County. While a receiver appointed under that statute is given the authority to borrow funds for necessary repairs and, with court approval, to "secure *that debt* and any moneys owed *to the receiver* for services performed" with a lien on the subject property (§ 17980.7, subd. (c)(4)(G), italics added), by its terms this authorization does not extend to payment of governmental costs of enforcement. On the contrary, the statute provides elsewhere that "[i]f the court finds that a building is in a condition which substantially endangers the health and safety of residents pursuant to Section 17980.6, upon the entry of any order or judgment, the court shall," among other things, "[o]rder *the owner* to pay all reasonable and actual costs of the enforcement agency including, but not limited to, inspection costs, investigation costs, enforcement costs, attorney

35

fees or costs, and all costs of prosecution." (*Id.*, subd. (d)(1), italics added; see also *id.*, subd. (c)(11) ["The prevailing party in an action pursuant to this section shall be entitled to reasonable attorney's fees and court costs as may be fixed by the court."].)

As the trial court found, the County's actions with respect to the property were instrumental in bringing it to the point where its numerous, ongoing nuisance conditions could finally be abated. Nevertheless, the trial court erred in equating the County's enforcement costs with those of the receiver, allowing them to be paid on a super-priority basis without consideration of the competing claims of other lienholders. We therefore reverse the trial court's sale order to that extent. (See *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 [a trial court abuses its discretion when it applies the wrong legal standard].) The County is of course free to raise any argument it sees fit before the trial court on remand with respect to its entitlement to a share of the remainder of the sale proceeds.

## III.   DISPOSITION

We affirm the trial court's orders authorizing a priority receiver's certificate and confirming the sale of the property free and clear of all liens, and reverse the court's sale order to the extent it prioritized the County's enforcement fees and costs on an equal footing with the receiver. The matter is remanded to the trial court for further proceedings consistent with this opinion. Our previously granted stay shall dissolve upon issuance of the remittitur in this matter. Respondents are entitled to their costs on appeal.

36

_____

Sanchez, J.

WE CONCUR:


_____

Humes, P. J.


_____

Margulies, J.


*A155837/A157245  County of Sonoma v. U.S. Bank*

37

Trial Court:          Sonoma County Superior Court

Trial Judge:          Hon. Patrick M. Broderick

Counsel:

Reed Smith, Raffi L. Kassabian, Kasey J. Curtis, Zachary C. Frampton, Todd S. Kim, for Defendant and Appellant U.S. Bank N.A.

Bruce D. Goldstein, Robert Pittman, County Counsel, Diana E. Gomez, Holly E. Rickett, Deputy County Counsel, for Plaintiff and Respondent

California Receivership Group, Mark S. Adams, Andrew F. Adams, for Defendant and Respondent

*A155837/A157245  County of Sonoma v. U.S. Bank*